**AFFIRMED as MODIFIED and Opinion Filed March 2, 2023**



**In the**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-21-01038-CR**

**DATRAIL DEON CLAYTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F19-75881-T**

## MEMORANDUM OPINION

Before Justices Carlyle, Goldstein, and Kennedy
Opinion by Justice Carlyle

Following Datrail Deon Clayton's not-guilty plea, a jury convicted him of murder, enhanced by a prior felony offense. The jury assessed punishment at life imprisonment and a $10,000 fine. Mr. Clayton contends the trial court fundamentally erred by not including a "defense against multiple assailants instruction" in the jury charge. In a cross-point, the State asserts the trial court's judgment should be modified to reflect the imposed fine. We affirm as modified in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

**Background**

The indictment in this case alleged that on June 4, 2019, Mr. Clayton (1) "intentionally and knowingly cause[d] the death of [M.T.]"[1] by shooting him with a gun and (2) "intend[ed] to cause serious bodily injury to [M.T.] and . . . commit[ed] an act clearly dangerous to human life" by shooting him with a gun, which caused his death.

At trial, J.G. testified that on the date of the shooting he was thirteen years old and lived at Sterlingshire Apartments in Dallas. That afternoon he played football near the apartment complex with his friends M.T. and K.M. On their way back to the apartment complex, they stopped to buy snacks and drinks from a nearby convenience store. J.G. stated that as they walked away from the store, "a car just drove past and started shooting and we just took off running." When they reached the apartment complex, M.T. told J.G. he had been shot. J.G. testified he did not see the shooter but heard shots that he guessed came from "the side of us."

Michael Dukes testified he was working as a security guard at Sterlingshire Apartments on the day of the shooting. The apartment complex is adjacent to a carwash and there is a convenience store on the other side of the car wash. A bus stop is located outside the apartment complex near the carwash, with three lanes of traffic running in each direction.

---

[1] In this opinion, we refer to all minors only by their initials. *See* TEX. R. APP. P. 9.10.

Mr. Dukes stated that on the day in question there was a lot of pedestrian and vehicle traffic in the area. As he came on duty, he was talking with M.T.'s mother, a resident of the complex. Then, he heard what sounded like gunshots and ran to the front of the complex. He saw M.T. collapse and realized M.T. had been shot. Mr. Dukes called 911 and began rendering first aid. He testified he did not see the shooter, but the gunshots were "so loud that it sounded as if somebody was shooting next to us."

K.M. testified that as he, M.T., and J.G. left the convenience store on the day in question, someone "started shooting" from a gray car "that was driving by." M.T. and J.G. began running, but K.M. "froze up" and "couldn't move." K.M. stated that at that point, "someone on the side of me" started shooting. That shooter came out of a black car parked in front of the convenience store and was later identified as Mr. Clayton. After the shooting stopped, K.M. ran to the apartment complex. He saw M.T. lying injured on the ground with others gathered around him. K.M. was "in shock." When police interviewed him a short time later that evening, he told them he saw two shooters in the gray car, "one in the front and one in the back," and that he "didn't think the people in the [gray] car realized that they had shot [M.T.]."

The State offered into evidence video footage recorded at the time of the shooting by several surveillance cameras in the area and "still images" extracted from the video footage. That evidence was published to the jury. The still images showed that at a time identified on the carwash's security camera footage as

"21:59:48" the gray car began to pass the carwash while heading away from convenience store. The car was in the far right lane and there was a person's arm extending from the back passenger seat window toward the back of the car with a gun pointing toward the convenience store. The still image showed no other weapon or shooter in the gray car. At 21:59:50, the arm and weapon were no longer extended from the gray car and that car had almost reached the bus stop. M.T. and J.G. were on the sidewalk ahead of the gray car and slightly past the bus stop. At 21:59:51, Mr. Clayton began to get out of his car at the convenience store. The store was set back from the street to allow for several gas pumps and he was parked near the store's entrance on the side next to the carwash. At 21:59:55, the still images showed he had moved a short distance away from his car toward the street and appeared to be shooting in the gray car's direction over a chain-link fence that separated the carwash and convenience store.

Dr. Jessica Dwyer, a forensic pathologist for the Office of the Medical Examiner of Dallas County, testified she performed an autopsy on M.T.'s body. The cause of death was "a penetrating gunshot wound" to the right side of his upper back. She recovered one bullet during her examination. She also testified it is possible that someone who sustained such an injury "would be able to run for a certain amount of distance."

Calvin Nelson, Jr. testified he was subpoenaed by the State to testify. On the day of the shooting, he went to a waterpark with some friends. He rode home in a

gray car with four other people. Mr. Nelson was in the back seat on the driver's side and his friend Tyler Buchanan was in the back seat on the passenger side. They stopped for gas at the convenience store. After they left the store, the car's driver made a U-turn and they passed the store again. At that point, Mr. Buchanan began shooting from the car toward the store. Mr. Nelson testified he did not "have a clue" as to why Mr. Buchanan began shooting. Mr. Nelson stated no one else in the car was shooting or had a gun.

Police recovered fired bullet fragments and sixteen fired cartridge cases in the area extending from the convenience store to the bus stop. Ballistics expert April Kendrick testified the cartridge cases came from at least two different guns and she could not rule out a possible third gun. Six of the cartridge cases had been fired from the same gun matching characteristics of a Smith and Wesson pistol. Those six cartridge cases were recovered near the spot where Mr. Clayton's car had been parked in front of the convenience store. Nine of the other cartridge cases were fired from a gun matching characteristics of a Glock firearm. Those were recovered in the street near the carwash and bus stop. Ms. Kendrick also testified the autopsy bullet was fired from a Smith and Wesson pistol.

Dallas police detective Jacob White testified he investigated this case. Based on the video footage and other evidence, he believed K.M.'s testimony was inaccurate and there was only one shooter in the gray car. A Glock firearm belonging to Mr. Buchanan was matched to the nine cartridge cases found near the carwash and

bus stop. Mr. Clayton's gun was never recovered and was last seen as he "was running away from the scene." Detective White also stated (1) "at the time [Mr. Clayton] was shooting, the threat was over" and (2) in his opinion Mr. Clayton did not act in self-defense.

The jury charge defined murder and manslaughter[2] and explained that pursuant to "transferred intent," "a person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person was injured, harmed, or otherwise affected." Additionally, the charge instructed the jury that if they found Mr. Clayton guilty of murder or manslaughter, they "must next consider whether the defense of justification is available, and if so, whether the Defendant's conduct was justified as deadly force in self-defense."[3] The jury charge stated:

> Now, bearing in mind all the foregoing, if you unanimously find beyond a reasonable doubt that the Defendant committed murder as charged in the indictment, or manslaughter as a lesser-included offense, but you further find from the evidence, or have a reasonable doubt thereof, that:

---

[2] The jury charge stated a person commits murder if he "(1) intentionally or knowingly causes the death of an individual; OR (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual," and a person commits manslaughter if he "recklessly causes the death of an individual."

[3] As to "justification," the charge explained that "reasonable belief" means "a belief that would be held by an ordinary and prudent person in the same circumstances as the actor." Then, the charge stated:

> A person is further justified in using deadly force against another:
> 1) if the actor would be justified in using force against the other, and
> 2) when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of murder.

–6–

1) the Defendant reasonably believed that force, when and to the degree used, was immediately necessary to protect himself against the use or attempted use of unlawful force by Tyler Buchanan, *and*

2) the Defendant reasonably believed that deadly force, when and to the degree used, was immediately necessary to protect himself against the use or attempted use of unlawful deadly force by Tyler Buchanan, or to prevent Tyler Buchanan's imminent commission of murder,

then you must acquit the Defendant and say by your verdict "not guilty."

If you do not so find, and you do not have a reasonable doubt thereof, you will reject the justification of deadly force in self-defense, and you must find the Defendant GUILTY of murder or manslaughter as described below.

During closing, the State contended Mr. Clayton committed "an unreasonable act of retribution" and "is guilty of murder, the intentional or knowing killing of [M.T.] through his intent towards Tyler Buchanan." The State asserted, "That is anger. He left the safety of his car to go chase down that other vehicle and shot at that vehicle over and over and over. That is not self-defense. It was not immediately necessary. There is nothing reasonable about what he did at all." Additionally, the State argued on rebuttal, "You can see it on the video. . . . He has to get up and reach over the fence to continue shooting. . . . That's not taking cover in returning fire, that's chasing after somebody and shooting back."

Defense counsel argued during closing (1) "[t]here were two people shooting from that [gray] car"; (2) the State did not "prove[] that [Mr. Clayton's] bullet caused the result"; (3) "[Mr. Clayton] may have made a mistake, but I submit to you that it

was reasonable under the circumstances that he found himself in at that time"; and (4) Mr. Clayton was "trying to defend his life."

**Analysis**

In reviewing complaints of jury charge error, we first determine whether error exists. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Keller v. State*, 604 S.W.3d 214, 229 (Tex. App.—Dallas 2020, pet. ref'd). If error exists, we must determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Keller*, 604 S.W.3d at 229. When, as in this case, the alleged jury charge error was not objected to, we reverse only if the error "was so egregious and created such harm that appellant was denied a fair trial." *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Charge error is egregiously harmful if it "affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id*. (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). In assessing harm, we consider "(1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial

record as a whole." *Id*. We will not reverse a conviction unless the defendant has suffered actual rather than theoretical harm. *Id*.

In each jury trial in a criminal case, the judge shall deliver to the jury "a written charge distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. art. 36.14. Though article 36.14 imposes no duty on trial courts to sua sponte instruct juries on unrequested defensive issues, a trial court errs when it does charge on a defensive issue, whether sua sponte or on a party's request, but fails to do so correctly. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013).

"A person is justified in using deadly force against another . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force," if the actor's actions would be justified under Texas Penal Code section 9.31.[4] TEX. PENAL CODE §§ 9.32(a), 9.31. When the evidence viewed from the defendant's standpoint shows an attack or threatened attack by more than one assailant, the defendant is entitled to a "charge on the right of self-defense against multiple assailants." *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985); *accord Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). A multiple assailants instruction allows the jury to consider whether the defendant "reasonably believed that deadly force was immediately necessary to protect himself from the

---

[4] Section 9.31 addresses the use of force in self-defense generally and describes several specific circumstances in which the use of force against another is unjustified, none of which either party contends are applicable here. *See* TEX. PENAL CODE § 9.31(b).

use or attempted use of unlawful deadly force from the group at large." *Dugar v. State*, 464 S.W.3d 811, 817 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). "The theory behind the multiple assailants charge is that, when it is clear that an attack is being conducted by multiple people as a group, a defendant is justified in using force against any member of the group, even if the recipient of that force is not engaging in conduct that would, by itself, justify the use of force." *Dickey v. State*, 22 S.W.3d 490, 493 (Tex. Crim. App. 1999) (Keller, J., concurring).

**Analysis**

Mr. Clayton contends the trial court's "exclusion of an instruction explaining [he] was permitted to defend himself against multiple individuals" was error and "fundamentally affected his right to a fair trial." He asserts he was egregiously harmed because:

> Although both sides spent a significant amount of time throughout the trial generally stressing self-defense, the jury was never instructed or explicitly directed by counsel at any point that it could find Clayton was justified in his actions based on the idea that he reasonably apprehended actual or apparent danger from the multiple individuals shooting at him. And substantial, contested evidence was brought forth to vouch for the defense's position that multiple people were shooting towards Clayton and others at the [convenience store]. Had this evidence raised a reasonable doubt with the jury, it would have acquitted Clayton, but the jury was not aware that this was permitted by law.

Even assuming without deciding charge error exists here, we cannot agree with Mr. Clayton that the complained-of error caused sufficient harm to warrant reversal.

Mr. Clayton describes the desired instruction as stating "that [the jury] could find Clayton was justified in his actions based on the idea that he reasonably apprehended actual or apparent danger from the multiple individuals shooting at him." To the extent he contends the requirement of immediate necessity regarding the use of deadly force would not be applicable to a multiple assailants instruction, he cites no authority to support that position and we have found none. As described above, the jury charge properly instructed the jury on the general law regarding use of deadly force in self-defense. Though the charge applied that law only as against Mr. Buchanan, the requirement of immediate necessity would not have changed if the charge had addressed self-defense against multiple assailants. *See Jordan*, 593 S.W.3d at 345; *Dugar*, 464 S.W.3d at 817.

Further, though Mr. Clayton's defense focused primarily on raising doubt that he fired the bullet that hit M.T., the record shows self-defense was also contested at trial. The still images from the video footage showed that before Mr. Clayton left his car, ran toward the street, and began shooting over the chain-link fence, the gray car was moving away from him past the bus stop and the arm holding the gun had been withdrawn into the car. The parties addressed reasonableness and immediate necessity at closing and the jury necessarily rejected self-defense as against Mr. Buchanan, a passenger in the car. Thus, even if the jury had been given a self-defense instruction regarding multiple assailants in the gray car, the record provides no indication the jury would have found Mr. Clayton reasonably believed deadly force

–11–

was immediately necessary to protect himself against a group in that car. *See Phillips v. State*, No. 05-99-01569-CR, 2001 WL 1256642, at *1 (Tex. App.—Dallas Oct. 22, 2001, no pet.) (not designated for publication) (concluding that where jury found against defendant on self-defense as to particular assailant who was allegedly part of a group, there was no reasonable probability that multiple assailants instruction would have resulted in different outcome at trial); *Walker v. State*, No. 07-10-0299-CR, 2011 WL 5007978, at *3 (Tex. App.—Amarillo Oct. 20, 2011, pet. ref'd) (mem. op., not designated for publication) (concluding jury's rejection of defendant's self-defense theory against alleged assailant indicated jury also would have rejected self-defense theory involving multiple assailants acting with alleged assailant); *see also Dickey*, 22 S.W.3d at 493 (Keller, J., concurring) ("[F]or the jury to have believed that Brown and Marvis were about to conduct a group assault against appellant, the jury must also have believed that Brown was preparing personally to assault appellant. The latter theory was contained in the jury charge, and the jury's rejection of that theory necessarily shows that the jury would also have rejected a multiple assailants theory."). On this record, we conclude Mr. Clayton was not egregiously harmed by the trial court's purportedly erroneous self-defense instruction. *See Villarreal*, 453 S.W.3d at 433.

**The State's cross-point**

The record shows the jury's returned verdict form assessed punishment at life imprisonment and a $10,000 fine. Upon receiving the jury's punishment verdict, the

trial court read that verdict aloud on the record in Mr. Clayton's presence. Then, the trial judge orally pronounced sentence but did not mention the fine, nor did the trial court include the fine in its written judgment. The State requests that we modify the judgment "to reflect the imposed fine so that it may accurately reflect the underlying proceeding."

We have the authority to reform the trial court's judgment to speak the truth when the record provides the necessary information to do so. *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd); *see also* TEX. R. APP. P. 43.2(b). "A jury's lawful verdict on punishment is inviolate, and the trial court must abide by it." *Ette v. State*, 559 S.W.3d 511, 517 (Tex. Crim. App. 2018) (concluding fine assessed by jury could be properly imposed despite trial judge's failure to orally pronounce it). Here, because the $10,000 fine was part of the sentence assessed by the jury and was within the permissible range of punishment, the trial court was required to include it in the written judgment. *Id*. at 516–17; *see also* TEX. CODE CRIM. PROC. art. 42.01, § 1(8). Thus, we modify the trial court's judgment to include the $10,000 fine assessed by the jury.

We affirm the trial court's judgment as modified.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

Do Not Publish
Tex. R. App. P. 47.2(b)
211038F.U05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

DATRAIL DEON CLAYTON,
Appellant

No. 05-21-01038-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F19-75881-T.
Opinion delivered by Justice Carlyle. Justices Goldstein and Kennedy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to include the $10,000.00 fine assessed by the jury.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered March 2, 2023